565 A.2d 1015

MARYLAND DEPARTMENT OF HUMAN RESOURCES,
Maryland Department of Health and Mental Hygiene,
Harford County Health Department

v.

BO PEEP DAY NURSERY.

No. 24, Sept. Term, 1989.

Court of Appeals of Maryland.

Nov. 13, 1989.

574

Lawrence H. Norton, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Ralph S. Tyler, Andrew H. Baida, Daniel J. O'Brien, Asst. Attys. Gen., all on brief), Baltimore, for petitioners.

Paul A. Dorf, Stephen A. Markey, III, Adelberg, Rudow, Dorf, Hendler and Sameth, Baltimore, amicus curiae, for

People Against Child Abuse (PACA), Md. Chapter of the American Academy of Pediatrics (AAP), Lawrence Wissow, M.D., Ass'n for Childcare Excellence (ACE), Md. Coalition Against Sexual Assault (MCASA).

Michael Genz, Emily Buss, Tobie Bernstein, Baltimore, amicus curiae, for The Legal Aid Bureau.

Thomas J. Peddicord, Jr. (Thomas G. Young, III, Marlow, Peddicord & Young, P.A., all on brief), Towson, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

RODOWSKY, Judge.

This is an administrative appeal in a business license revocation case. Appellant, Department of Human Resources, the successor licensing agency, revoked appellee's license as a child care center based on findings, after hearings, that a number of preschool age children were victims of physical and sexual abuse while in appellee's care. Before the proceedings began the agency's hearing officer denied appellee's request for discovery by way of psychological interviews of the alleged victims by an expert selected by appellee. On appeal from the revocation order the circuit court remanded, having concluded that the agency's denial of the discovery request violated appellee's constitutional right to procedural due process. That ruling is the primary issue before us. For reasons set forth below, we shall reverse and direct affirmance of the agency's order.

Child care centers are licensed and regulated by the State. Prior to July 1, 1988, the licensing authority was the county health officer, while the authority to review a health officer's decisions and to adopt regulations was in the Department of Health and Mental Hygiene. Md.Code (1982, 1987 Repl.Vol.), §§ 14–101 through 14–114 of the Health–General Article. By Ch. 247 of the Acts of 1988,

authority to administer this regulatory licensing system was lodged in the Department of Human Resources. See Md.Code (1984, 1989 Cum.Supp.), §§ 5–570 through 5–585 of the Family Law Article. The license year runs from April 1 through March 31.

Bo Peep Day Nursery (Bo Peep) is a child care center conducted by Deborah Cassilly (Deborah) who is the licensee. The center is conducted on premises improved by a free-standing, three story building in Bel Air, Harford County. Deborah, who holds a bachelor's degree in early childhood education, had worked while she was in school at a child care center conducted on those premises. In January 1984 Deborah, then approximately twenty-three years of age, and her husband, Patrick Cassilly (Patrick), purchased the property from the prior owners/operators. The first two floors of the building are used for the child care facility. There are four classrooms, an office, a kitchen and a restroom on the first floor, and there are four classrooms and a restroom on the second floor. Until late July 1987, Deborah, Patrick and at that time their two children occupied the residential apartment on the third floor of the building.

Not every child who is enrolled at Bo Peep comes to the care center every day and not every child who comes to the center remains there the entire time the center is open. In the winter of 1986–87 the total enrollment at Bo Peep was approximately eighty children of whom no more than sixty were present at any one time. By May 1988 the enrollment was fifty-two children and the maximum number of enrollees at any one time was thirty-three.

In the period September 1986 through June 1987, a typical day at Bo Peep would proceed in the following fashion. Bo Peep began receiving children at 6:30 a.m. The children played on the first floor until approximately 8:00 a.m. when those children who attended kindergarten or grade school were taken by Bo Peep staff to their respective schools. Those enrollees who remained at Bo Peep for part or all of the rest of the day were divided into groups for the morn-

ing structured programs. The three year old group stayed on the first floor. The four year old and five year old groups were in classrooms on the second floor. Lunch was served around midday. From approximately 12:30 to 2:30 p.m. was nap time for the three and four year olds. No more than ten children utilized a classroom on the first floor for napping with any overflow using a second classroom on that floor. After their naps, the children watched TV, had a snack around 3:00 p.m., and played games of their choice until their parents or others took them home.

State regulations for child care centers require that a supervisory senior staff person be present at all times that enrolled children are on the premises. Md.Regs.Code tit. 10, § .05.01.58 (1985) (COMAR).[1] The operator of a center must periodically file staffing schedules with the regulating agency. COMAR 10.05.01.60 (1985). At Bo Peep Deborah usually scheduled herself for the early morning and late afternoon hours when parents would be coming to the facility. During much of 1986–87 the senior staff person scheduled to supervise at Bo Peep from 8:30 a.m. to 11:30 a.m. was Rita Blevins (Blevins), who had been employed there from February of 1985. Patrick was not one of the regular staff at Bo Peep. He was employed at an automobile dealership.

In July 1987, the Harford County Health Officer wrote Deborah advising that Bo Peep's license would be suspended. Three days later the Circuit Court for Harford County (Carr, J.) enjoined adult males from the Bo Peep premises from 6:30 a.m. to 6:30 p.m. Monday through Friday. On July 27, 1987, after four days of hearings, that court (Whitfill, J.) barred Patrick from the premises at all times, ordered a log to be kept of all male visitors, and directed the Bel Air Police to make random checks at Bo Peep.

---

**1.** The cited regulations of the Department of Health and Mental Hygiene continue in effect under the Secretary of Human Resources pursuant to the transfer provisions in SECTION 4 of Ch. 247 of the Acts of 1988.

Bo Peep appealed the health officer's suspension order. William F. Clark, Esq. (Clark), the chief hearing examiner in the Department of Health and Mental Hygiene, conducted hearings over seven days in August and September and recommended suspension of the Bo Peep license for the remainder of its term. In his report, which was adopted by the departmental secretary's designee, Clark made the following ultimate finding:

"I conclude that the facts as found in Part XI reflect that many children of Bo Peep were subjected to injurious treatment. Chief among those problems . . . is that children at Bo Peep have been sexually abused. The evidence in this case points in no other direction. While sexual child abuse is difficult to prove, and there may be conflicting reports from the children, the physical examination of the children involved here and their behavioral changes as observed by their parents and trained professionals allow no other conclusion to be drawn."

In March 1988, the departmental board of review affirmed. About one week before the expiration of its license for 1987–88, Bo Peep obtained from the circuit court (Whitfill, J.) an order staying the suspension for the remainder of that license year. That order to stay incorporated the conditions of the July injunction.

Also in March 1988, the county health officer denied Deborah's application for a renewal of Bo Peep's license for the period April 1, 1988, to March 31, 1989. Bo Peep sought administrative review of that revocation. The matter was again assigned to Clark. Hearings were set to begin May 11, 1988, when, on May 2, Bo Peep's counsel wrote to Clark requesting a postponement. Bo Peep also requested that Clark

"order the State to make available for interview those children who were involved with allegations of child abuse at Bo Peep. It is not intended that the interview would be conducted through counsel, but by a health professional of our choosing. The purpose of such interviews would be to attempt to resolve confusing and

contradictory reports by others of the children's statements which have figured in past proceedings in this matter.

"If we are not provided with the above information and interviews, we intend to move to exclude from the proceeding, on the grounds of violation of due process and fundamental fair play, the use by the State of any evidence derived from information to which we were denied access."

At the commencement of the hearing, counsel for Bo Peep pointed out that "[w]e have moved, through various letter motions, for discovery and for postponement and they're intertwined." Counsel stated, in part, that they "would like an opportunity to have people on whom we have greater confidence and faith examine the children, if there is to be new evidence here." Clark denied the discovery motion.

The hearings on the propriety of the revocation order extended over nine days, ending June 8, 1988. Introduced by the State as part of the record of the revocation proceeding were the records of the agency's suspension order hearing and of the circuit court's injunction hearing, including seven days of transcripts of the former and four days of transcripts of the latter.

While Clark had the revocation matter under advisement, the State obtained an ex parte injunction from the Circuit Court for Harford County (Baldwin, J.) barring Blevins from the Bo Peep premises. Then, in those court proceedings, Bo Peep moved on the recited authority of Maryland Rule 2–423 for an order that the allegedly abused children "undergo diagnostic examination of the genital region to evaluate visible evidence of sexual assault[.]" Bo Peep designated the director of the Rape Care Center at Greater Baltimore Medical Center as their examining physician.

Before the circuit court ruled on Bo Peep's motion, Clark filed the proposed agency decision in the revocation case. We set forth his explanation of the ultimate conclusion.

"Regarding the issue of physical and sexual abuse of children having occurred at the Bo Peep facility, it is concluded that the preponderance of the testimony and evidence presented at this administrative hearing confirms the likelihood of those events, and supports the position of the Harford County Health Officer. The testimony of the the therapists and the parents is compelling, and substantiates the bases used by the Health Officer in denying relicensure. In weighing the testimony of the State's witnesses and the Appellant's witnesses, it is concluded that the evidence clearly shows that the license should not be renewed, based upon the mistreatment of children at the Bo Peep facility. A careful reading of the entire record in this case quite clearly shows that it is improbable for the events not to have occurred substantially as related by the children to their parents and to their therapists. The verbalizations, drawings, and the emotions of the children, as observed by their parents and by trained and licensed professionals, and the physical evidence as found by [two examining physicians selected by the State], have not been refuted or shown to be erroneous or misinterpreted."

The decision was adopted by the Secretary, Department of Human Resources (the Department) in August 1988, and Bo Peep appealed.

██ That appeal was consolidated with the earlier appeal in the suspension case. The circuit court (Baldwin, J.) stayed enforcement of the revocation order pending disposition of the administrative appeals. Judge Baldwin also refused to order medical examinations. Because neither the children nor their parents were parties to the litigation, the circuit court correctly concluded that it had no authority under Rule 2–423 to grant that requested relief.

Concerning the administrative appeals, Judge Baldwin held that the appeal from the suspension order was moot, and that holding is not challenged here. In the appeal from the revocation order the circuit court ordered a remand to the Department for further proceedings. The court also

continued the judicial stay of the Department's revocation order during the pendency of the remand.

The Department appealed the circuit court's order of remand. We granted the State's petition for a writ of certiorari prior to consideration of the appeal by the Court of Special Appeals. Bo Peep has moved to dismiss the Department's appeal. We deny that motion for reasons stated in Part I of this opinion.

The apparent purpose of the remand to the Department was to give the State an opportunity to cure what the circuit court believed to be a defect of constitutional dimension in the administrative procedure. None of the alleged victims of child abuse testified in any proceedings. Hearsay, of which the alleged victims were the declarants, was admitted through parents and others who had spoken with the children. Finding the content of the children's statements to be "foundational," the circuit court reasoned that Bo Peep's request for an interview of the children by a psychologist of Bo Peep's choice would have given the licensee "a *meaningful* opportunity to test the credibility of the out-of-hearing statements," but Bo Peep's request for such an interview was denied. Recognizing that the hearing officer had no authority to order the type of discovery requested by Bo Peep, the circuit court nevertheless concluded that under those circumstances the hearing officer "should not have considered any of the evidence which was dependent on the foundational out-of-hearing statements where circumstances prevented an opportunity to challenge." We discuss this issue in Part II, *infra*.

The circuit court also found that the hearing officer had erred in restricting the scope of cross-examination by Bo Peep of a police officer who had participated in the investigation of suspected child abuse. We address that question in Part III hereof.

Bo Peep argued, and the circuit court found, that the licensing agency had violated its own regulations by failing to reinspect the premises of the child care center prior to

revocation. Bo Peep also sought, but failed, to persuade the circuit court that Clark should have recused himself from conducting the revocation hearing. Parts IV and V, below, respectively deal with those arguments advanced here by Bo Peep as additional support for the circuit court's result.

Bo Peep does not argue that there was a lack of substantial evidence before the agency to support its findings of physical and sexual child abuse at Bo Peep. Consequently, we need not review the evidence in detail. In Part II we shall review the evidence only to the extent needed to illustrate Bo Peep's due process contention.

## I

Bo Peep, relying on the *McKinney–Peco* doctrine, has moved to dismiss the Department's appeal. *See Zoning Appeals Bd. v. McKinney,* 174 Md. 551, 199 A. 540 (1938) and *Maryland Pharmacy Bd. v. Peco, Inc.,* 234 Md. 200, 198 A.2d 273 (1964). In a line of cases beginning with *McKinney,* "this Court has taken the position that certain administrative agencies acting in a 'quasi-judicial' capacity cannot appeal the reversal of their decisions by a circuit court, unless the authority to appeal is specifically provided by statute." *Consumer Protection Div., Office of the Attorney Gen. v. Consumer Publishing Co.,* 304 Md. 731, 742, 501 A.2d 48, 54 (1985). In *Consumer Protection,* Judge Eldridge, writing for the Court, analyzed the *McKinney–Peco* line of cases and pointed out that the doctrine does not apply to all agencies. It does not apply to agencies whose functions " 'are so identified with the execution of some definite public policy as the representative of the State, that their participation in litigation affecting their decisions is regarded by the Legislature as essential to the adequate protection of the State's interests.' " *Consumer Protection,* 304 Md. at 743, 501 A.2d at 54 (quoting *McKinney,* 174 Md. at 561, 199 A. at 545).

In *Consumer Protection* we concluded that that Division in the Attorney General's Office was not the kind of non-ad-

versarial, quasi-judicial agency contemplated by the doctrine. The Division's statutory powers included the power to receive and investigate complaints, to initiate investigations, to issue cease and desist orders, to adopt rules and regulations and to seek injunctions. We held that "[w]ith its many different functions, its mandate to protect consumers and its role as a representative of the interests of the State, the Division is not the type of agency to which the rationale of *McKinney* applies." 304 Md. at 746, 501 A.2d at 56.

■ The reasoning of *Consumer Protection* applies with equal force here to permit the Department to pursue its strong interest in the outcome of this case which it initiated and vigorously prosecuted by appealing the reversal of its order. The statutory regulation of child care centers in Family Law Article, Title V, "Children," Subtitle 5, "Child Care; Foster Care," contains legislative findings and statements of purpose in § 5–571. These include a finding that "if care of a child is given over to another, mental and physical risks arise that need to be offset by reasonable protective measures." § 5–571(a)(1)(ii). The purpose of the child care subtitle

"is to aid each parent and protect each child from the risk present if:

"(1) the child is cared for by an individual other than a relative or friend; and

"(2) children of more than one family are cared for together...."

§ 5–571(b). Pursuant to those findings and purposes the Secretary of the Department is given authority to adopt rules and regulations which shall ensure, *inter alia*, "proper care, protection, and supervision of children in child care centers[.]" § 5–573(b)(2). The Department is authorized to issue, deny, suspend and revoke licenses for child care centers. §§ 5–574 through 5–580. The Secretary of the Department, or the Secretary's designee, is authorized to petition a circuit court to enjoin unlicensed child care center

operations. § 5–580(e). Child care centers must be open to inspection by, *inter alia,* representatives of the Department. COMAR 10.05.01.80 (1988).

All cases of suspected child abuse are reported to a local department of the Social Services Administration. *See* Family Law Article, §§ 5–704 through 5–706. The Social Services Administration is a division of the Department. § 5–501(b). Each local department is required to notify the designee of the Secretary of the Department within forty-eight hours after the local department's receipt of a report of suspected child abuse. The Secretary's designee then convenes a multi-disciplinary team, which the Secretary's designee chairs, to coordinate procedures to be followed in investigating and otherwise responding to the report. § 5–584.

Thus, the role of the Department in cases of suspected child abuse, particularly at a child care center, is not a passive one of quasi-judicial adjudication, but is an active role of policy formulation and protection of children.

The Department may appeal the circuit court's order.

## II

The next issue is whether the procedure which resulted in the revocation of Bo Peep's child care center license violated due process because the procedure did not include a method for, and Bo Peep was not allowed to conduct, a psychological examination by an expert of its choice of the allegedly victimized children. In this Part II we shall (A) explain the general evidentiary framework of the case; (B) illustrate the due process problem by reviewing the evidence relating to a specific child; and (C) analyze and decide the constitutional issue.

## A

The due process issue arises out of the largely circumstantial way in which the Department proved child abuse at Bo Peep. In general that proof fell into four categories: (1)

testimony by physicians stating their observations when physically examining children and expressing their medical opinions based upon those observations; (2) testimony of parents, social workers and psychologists narrating their observations of relevant nonassertive verbal and nonverbal conduct of the children; (3) statements of history to treating clinicians; and (4) testimony from parents, social workers or other adults relating other assertive statements of the children, that is, statements relevant only for the truth of the content of the statements.

Medical members of the interdisciplinary team or teams assembled to evaluate possible sexual child abuse at Bo Peep were Drs. Charles Schubin and Michael Reichel. Dr. Schubin is an assistant professor of pediatrics at the University of Maryland Hospital who has examined between 2,000 and 3,000 children for evidence of sexual abuse. Dr. Reichel is assistant chairman of the Department of Pediatrics at Greater Baltimore Medical Center and has consulted in over 200 hundred cases of various forms of abuse of children. They collectively examined nineteen children who had attended Bo Peep during the summer of 1987 and concluded that eight, of whom seven were females, exhibited physical conditions consistent with sexual abuse. These conditions principally were gross enlargement of the hymen, vaginal scars and tears, and anal gaping and scarring. Each of the doctors testified in person and was subjected to cross-examination.

The relevance of the nonassertive verbal and nonverbal conduct of the children lies in certain behavior which is indicative of sexual abuse. Hearing Officer Clark explained the relevance and reliability of this class of evidence, saying:

"Certain behavioral changes exhibited by young children are indicative that trauma has occurred to them, and certain behaviors are unlikely to be exhibited as a result of any trauma other than sexual abuse. Visible trauma to the sexual organs of children is indicative of sexual abuse; so is inappropriate sexual behavior with peers,

toys, or animals; so is verbalizing sexual language or knowledge that is atypical for that child's age. As the number of those physical confirmations rise in a particular day care center population, the concern is heightened that such abuse has in fact occurred there. An example of behavioral indications that sexual abuse has occurred to her, is when a young child, three or four years old, becomes very sexually provocative, or has a marked change in her sexual activities. Other behavioral changes brought about in children who have been sexually abused include regression, i.e. toilet trained children begin to wet or soil themselves; loss of appetite; breaking out in rashes; crying; constipation; sleep disturbances; phobias or avoidance behavior; withdrawal or depression; aggressive behavior; excessive masturbation; hysterical reactions; perpetration of sexually unacceptable conduct upon others; genital or urethral trauma; genital infections; recurrent urinary tract infections; abdominal pain; and other manifestations."

The hearing officer's view of the probative value of that evidence is supported in the literature. *See* Finkelhor, Williams, Burns & Kalinowski, *Sexual Abuse in Day Care: A National Study*, Family Research Laboratory, U. of New Hampshire at 7–8 (1988); Berkowitz, *Sexual Abuse of Children and Adolescents*, 34 Adv. Pediatr. 275, 278–79 (1987); Herbert, *Expert Medical Assessment in Determining Probability of Alleged Child Sexual Abuse*, 11 Child Abuse & Neglect 213, 216–17 (1987); Wherspann, Steinhauer & Klajner–Diamond, *Criteria and Methodology for Assessing Credibility of Sexual Abuse Allegation*, 32 Can. J. Psychiatry 615, 622 (1987); Paul, *"What Really Did Happen to Baby Jane"—The Medical Aspects of the Investigation of Alleged Sexual Abuse of Children*, 26 Med. Sci. Law 85, 96–102 (1986); Krugman, *Recognition of Sexual Abuse in Children*, 8 Pediatr. in Review 199, 202–04 (1986); de Young, *A Conceptual Model for Judging the Truthfulness of a Young Child's Allegation of Sexual Abuse*, 56 Amer. J. Orthopsychiat. 550, 555–56 (1986); Hunter, Kilstrom &

Loda, *Sexually Abused Children: Identifying Masked Presentations in a Medical Setting,* 9 Child Abuse & Neglect 17, 19 (1985).

The adults who testified to the relevant, nonassertive verbal and nonverbal conduct of the children did so in person and were subject to cross-examination. Testimony of the type described in this second category of proof would have been admissible in a judicial proceeding. *See In re Dependency of Penelope B,* 104 Wash.2d 643, 709 P.2d 1185 (1985) (en banc).

The third class of proof concerns a clinical psychologist, as to two children from Bo Peep whom she was treating, and a clinical social worker, as to three children from Bo Peep whom she was treating.[2] They opined that the children had been sexually abused at Bo Peep. These opinions were based on personal observations of, and parental reports of, conduct of the type described above, as well as on statements made to the experts by the children in therapy sessions. Both of these experts were subject to cross-examination.

■■■ The testimony of these witnesses was sufficiently reliable to be admissible in this administrative proceeding, whether or not some or all of the hearsay declarations of the children embodied within that testimony would have been admissible in a judicial proceeding. Under the law of evidence, as a general proposition, statements of medical history, made by a patient to a treating medical practitioner for the purpose of treatment, may be admitted as substantive evidence through the medical witness. If the medical practitioner is engaged only to render an expert opinion, and not for purposes of treatment, statements of history related by the patient are admissible through that witness for the limited purpose of explaining the basis for the expert's opinion. *See State v. Allewalt,* 308 Md. 89, 517

---

**2.** As to treatment by clinical social workers see COMAR 10.42.02 and 73 Op. Att'y Gen. (Md.) 319 (1988) [Opinion No. 88–049 (Nov. 9, 1988)].

A.2d 741 (1986); *Beahm v. Shortall,* 279 Md. 321, 368 A.2d 1005 (1977). From the standpoint of reliability, hearsay of the subject type has been recognized as evidence by the United States Court of Appeals for the Fourth Circuit. Applying Fed.R.Evid. 803(4), that court held that statements describing abuse, made by a four year old child to her psychologist for purposes of treatment, are admissible as substantive evidence. *Morgan v. Foretich,* 846 F.2d 941 (4th Cir.1988). And *see United States v. Renville,* 779 F.2d 430 (8th Cir.1985).[3]

In the fourth class of evidence in the Department's case, adults related assertive statements made by children, not for purposes of medical treatment, in which the children described, in their terms, acts of physical and sexual abuse said to have been committed on them at Bo Peep. From the standpoint of comparison to a judicial proceeding particular statements may or may not have qualified as admissible hearsay under the excited utterance exception. *Compare United States v. Iron Shell,* 633 F.2d 77 (8th Cir.1980), *cert. denied,* 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981); *United States v. Nick,* 604 F.2d 1199 (9th Cir.1979); *Moore v. State,* 26 Md.App. 556, 338 A.2d 344, *cert. denied,* 276 Md. 747 (1975) (exception applied) *with Cassidy v. State,* 74

---

**3.** The instant matter is substantially distinguishable from *Bohnert v. State,* 312 Md. 266, 539 A.2d 657 (1988) where we excluded a purportedly expert opinion that a child, age seven (Joint Record Extract, Vol. 1, at 91–96), had in fact been sexually abused. That criminal prosecution involved application of the rules of evidence. The expert was a protective service investigator with the Social Services Administration who had investigated the complaint, *id.* at 219, 539 A.2d 657, whereas the witnesses in the matter before us were treating clinicians. With respect to underlying reliability, we held that there was an insufficient basis for any opinion by the witness in *Bohnert* who had not subjected the child to any type of objective tests, who had found no need to review medical reports, who did not compare the child's behavior to general behavioral characteristics of child abuse victims and who relied, at least in part, on " 'a certain sense about children[.]' " *Bohnert,* 312 Md. at 272, 539 A.2d at 660. Under the circumstances in *Bohnert* we also concluded that the opinion was no more than the witness's conclusion that the child, as opposed to Bohnert, was telling the truth.

Md.App.1, 536 A.2d 666, *cert. denied,* 312 Md. 602, 541 A.2d 965 (1988) (exception inapplicable).

Deborah testified in Bo Peep's case. The thrust of her evidence was that Bo Peep was so closely supervised and so open to parents at all times that any abuse suffered by any children who happened to be enrolled there could not have occurred on the Bo Peep premises. A psychologist testified on behalf of Bo Peep from a review of medical records and transcripts of prior testimony, but without having examined the children. That expert opined, in essence, that the apparent abuse of particular children was explainable by masturbation, constipation, and/or separation anxiety, coupled with a strong suggestion of an overlay on the entire case of some hysteria on the part of some adults.

The hearing officer was persuaded that there was child abuse and that it had occurred at Bo Peep. Essentially Clark concluded that coincidence could not explain the number of children who bore physical findings consistent with sexual abuse, who manifested behavior indicative of having been sexually abused, and who were said to have described acts of physical and sexual abuse at Bo Peep.

### B

To illustrate the due process issue in a factually specific context, we shall review the evidence concerning child 7.[4] Bo Peep argues that "[t]he statements of child 7 are a prime example of the effect of the due process denial upon Bo Peep." Appellee's Brief at 27.

Child 7 is a female who was three and one-half years old in July 1987. Because the child had exhibited several symptoms of abuse, as listed in a brochure which the child's parents had obtained at a meeting sponsored by the Social Services Administration, the parents caused child 7 to be examined by Dr. Schubin on July 2, 1987. On that examina-

---

**4.** Numbers were used at trial and in the appellate briefs to identify particular children, in lieu of names.

tion the diameter of the child's hymen was two millimeters, a finding which was normal for her age. Child 7 did not thereafter attend Bo Peep until Monday, July 13. In the interim child 7 was constantly with her parents during the family vacation.

On Wednesday, July 15, the mother picked up child 7 at Bo Peep after 4:00 p.m. The child complained that her bottom hurt. The complaints continued into the evening. When bathing child 7 that evening the mother noticed a small cut near the child's vaginal area. On questioning the child told the mother that that was where Miss Debbie had put toilet paper in her. As a result the parents caused child 7 to be reexamined by Dr. Schubin on Friday, July 17 at noon. Dr. Schubin testified that on that examination the hymenal opening was then "grossly distorted" to ten by fifteen millimeters, with swelling and redness, in terms of a clock face, from two to six. In his opinion the injuries occurred within four to six days prior to his examination. In his opinion the child could not physically have produced the injury with her own hands by masturbating.

Child 7's mother testified that child 7 said on Friday that Mr. Pat was also there when Miss Debbie put toilet paper in her. On Saturday the child told the mother that "Miss Rita" (*i.e.,* Blevins) and "Miss Martha" were also there and that "a ball" had been put in her. At first she described the ball as orange and then as pink. She said this happened when she was in the kitchen on the table.

In September 1987 child 7 began to be treated by Mary Derbyshire (Derbyshire), a clinical social worker. Derbyshire was also treating two other children from Bo Peep whom she believed had been abused. Derbyshire testified for two full days in the revocation case. Her direct and cross-examinations, and related colloquy, are reported in approximately 575 pages of transcript. The notes which she made of sessions with the children were introduced in evidence and made available to Bo Peep's counsel overnight for preparation for cross-examination. Drawings made by the children in the therapy sessions were introduced as

exhibits. Child 7 was still in weekly therapy with Derbyshire when the latter testified in May 1988.

Derbyshire acknowledged that, particularly in the early phases of the treatment, the child "had confused thoughts that interfered with her being able to verbally articulate things in a way that she was experiencing them...." In September the child talked of Bo Peep as a bad place where Miss Rita had hurt the child's "operation." Child 7 had had a hernia operation resulting in a scar in her pelvic area. During a November session child 7 said that Miss Rita had beaten her "down there" (pointing to the vaginal area) when the child was going potty. When asked to demonstrate the child used both of her fists and started beating on her pelvic area. Derbyshire then asked the parents to join them and the child repeated the demonstration again. After each demonstration the child stated that she was just kidding. Derbyshire's interpretation of the statement, "just kidding," was that child 7 had difficulty accepting the reality of what had happened and that was her way of making the occurrence not real.

Child 7 refused to take naps. When Derbyshire was attempting to treat that fear, the child told Derbyshire that "Mr. Pat [had] sat next to her when she was asleep and he had newspapers ... and he put the newspapers on her and then he tried to choke her...." The child demonstrated by putting her hands around her neck. When child 7 talked about Miss Rita hurting the child's "operation," the child would tremble, shake, cry, and beg to go home. The child said that Miss Rita would beat her in the belly and demonstrated by placing the palm of one hand flat against her stomach and striking the back of that hand with her other hand in a fist. Derbyshire understood that to be a technique for beating a child without leaving a bruise.

The child also referred to Blevins as "big foot" and spoke of a "water machine" used to spray the children with colored water in a kitchen at Bo Peep. The specific testimony on these points is set forth in the margin.[5] Derbyshire

---

**5.** Describing a January 1988 session Derbyshire said that the child

testified that the child said that Miss Rita had told child 7 that if she ever told secrets she would be taken away on a bus. The child had a fear that if she took a field trip by bus with the children at her new nursery school she would never be brought home again.

Bo Peep's expert, Dr. Lawrence Donner (Donner), is a clinical psychologist. Donner testified for two full days in the revocation case. His direct and cross-examinations, and related colloquy, occupy approximately 455 pages of the transcript. His view was that child 7's "just kidding" remarks refer to the fact that it was a game which Derbyshire was asking child 7 to play. Donner also concluded from the different actors and situations included in the

---

"didn't like to come to the sessions because it made her think about things that were scary and I asked her what kind of things and she said Bo Peep, she was sobbing, she was shaking, she was wringing her hands, at times she was masturbating, she said she was afraid of big foot, that she thinks about Miss Rita pinching her in the bathroom and that Miss Rita was pinching her in the bathroom Mr. Pat and Miss Rita were there and that it was dark, she said that when they did that it hurt her on her belly and her operation and then she said there was a water machine in the attic and that the water machine was taken to the kitchen table and the kids were put on the kitchen table by Miss Rita and Mr. Pat, the kids had clothes off but Miss Rita and Mr. Pat had clothes on, the kids bodies were squirted with colored water, sometimes hot water, sometimes cold, all over their bodies including down there, sometimes the water was yellow, gold, pink or clear. And then she said sometimes Mr. Pat would hide in the dark bathroom when Miss Debbie was coming and then she said sometimes Mr. Pat went to the basement to get rope or was going to get the water machine...."

Speaking generally of the two months preceding her testimony in May of 1988, Derbyshire said that

"periodically this fear of big foot would be verbalized. At this particular point in time the child was able to, in a coherent fashion provide some more information in terms of the fear of big foot, what she said was that big foot used to get us in the kitchen with the tables. What that means is apparently there's more than one kitchen at Bo Peep and child number seven refers to one of these kitchens as a kitchen with a table and she said that big foot is Miss Rita and that Mr. Pat gave Miss Rita a big foot outfit when he dressed up as Santa at a bad Christmas party at Bo Peep. Miss Rita used to be big foot and scare us. Once again she describes Miss Rita hitting, quote, 'us like this', and describes the flat palm on her belly and then the fist beating the palm on her belly."

pattern of detail involved in child 7's descriptions that "there's no consistency in what she says. There's clearly no basis in terms of my opinion in reality in what she's saying."

## C

■ When the circuit court expressed its concern over the introduction into the agency hearing record of out-of-hearing statements by the children concerning "foundational" matters, the court was simply referring to hearsay concerning material facts. Hearsay which is inadmissible in a judicial proceeding is not per se inadmissible in an administrative proceeding. *See Fairchild Hiller Corp. v. Supervisor of Assessments for Washington County*, 267 Md. 519, 298 A.2d 148 (1973); *Tauber v. County Bd. of Appeals for Montgomery County*, 257 Md. 202, 262 A.2d 513 (1970); *Eger v. Stone*, 253 Md. 533, 253 A.2d 372 (1969); *Neuman v. Baltimore*, 251 Md. 92, 246 A.2d 583 (1968). Under the Maryland Administrative Procedure Act, applicable here, "[t]he agency may admit probative evidence that reasonable and prudent individuals commonly accept in the conduct of their affairs and give probative effect to that evidence." Md.Code (1984), § 10–208(b) of the State Government Article.

■ To accept Bo Peep's argument the circuit court's analysis had to escalate to the constitutional level. But procedural due process does not prevent an agency from supporting its decision *wholly* by hearsay, if there is underlying reliability and probative value. *See Richardson v. Perales*, 402 U.S. 389, 402, 91 S.Ct. 1420, 1428, 28 L.Ed.2d 842, 853 (1971) (in a federal social security disability hearing, "a written report by a licensed physician who has examined the claimant and who sets forth in his report his medical findings in his area of competence may be received as evidence ... and, despite its hearsay character and an absence of cross-examination, and despite the presence of opposing direct medical testimony and testimony by the claimant himself, may constitute substantial evidence sup-

portive of a finding by the hearing examiner adverse to the claimant, when the claimant has not exercised his right to subpoena the reporting physician. . . .").[6]

"Due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Joint Anti–Fascist Comm. v. McGrath,* 341 U.S. 123, 162, 71 S.Ct. 624, 643, 95 L.Ed. 817, 849 (1951) (Frankfurter, J., concurring). Currently the United States Supreme Court utilizes a balancing analysis in deciding questions of procedural due process. It was described for the Court by Justice Powell in a case involving termination of social security benefits, *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

"More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

*Id.* at 335, 96 S.Ct. at 903, 47 L.Ed.2d at 33.

■ We have neither been cited to, nor found, any decision involving administrative proceedings in which the contention was made that procedural due process required a prehearing examination of a nonparty by a health care professional. A straightforward application of the princi-

---

**6.** The State has argued that Bo Peep could have subpoenaed and examined the children whom the State alleged were abused. Bo Peep, on the other hand, asserts that it sought a psychological examination in lieu of subpoenas and of interrogation by counsel at the hearing. We will not rest our decision on this argument advanced by the State. To do so would imply that, had subpoenas for the children been sought and opposed by motion to quash, the hearing officer should have refused to quash in order to protect a due process right. That is not the issue before us and we intimate no opinion thereon.

ples quoted above from *Mathews v. Eldridge* demonstrates that due process has not been violated here.

2 R. Rotunda, J. Nowak & N. Young, *Treatise on Constitutional Law, Substance and Procedure* § 17.8, at 250 (1986) places in constitutional context the problem now before us.

> "Before examining the balancing test in operation, one should note the different elements of the adversary process which may be required as part of the 'due process' which must be afforded to an individual when the government deprives him of life, liberty or property. The essential elements are: (1) adequate notice of the charges or basis for government action; (2) a neutral decision-maker; (3) an opportunity to make an oral presentation to the decision-maker; (4) an opportunity to present evidence or witnesses to the decision-maker; (5) a chance to confront and cross-examine witnesses or evidence to be used against the individual; (6) the right to have an attorney present the individual's case to the decision-maker; (7) a decision based on the record with a statement of reasons for the decision."

(Footnote omitted). The authors list six additional procedural safeguards, including "a right to pre-trial discovery of evidence," which the authors state "tend to appear only in connection with criminal trials or formal judicial process of some type." *Id.*

The private interest to be affected by the license revocation is Deborah's continued operation of a day care center business on the premises. No liberty interest is at stake. *Cf. Coy v. Iowa,* — U.S. ——, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988); *Craig v. State,* 316 Md. 551, 560 A.2d 1120 (1989); *Wildermuth v. State,* 310 Md. 496, 530 A.2d 275 (1987) (accused's right of confrontation in criminal prosecution). The Cassillys' property interests in the realty and equipment are not at stake. Where, as here, the license to engage in a regulated business may not be withdrawn at the discretion of the licensing authority but only upon proof of certain contingencies, the procedure by which a state

undertakes to suspend or revoke the license is restrained by due process. *See Barry v. Barchi,* 443 U.S. 55, 64 n. 11, 99 S.Ct. 2642, 2649 n. 11, 61 L.Ed.2d 365, 375 n. 11 (1979). That case involved the suspension, prior to any hearing, of the license of a horse trainer pursuant to a state regulation which presumed negligence on the part of a trainer whose horse tested positive for drugs after a race. The Court held that the interest of the state in the integrity of racing justified the procedure, so long as a post-suspension hearing was promptly held. The regulation in *Barry v. Barchi* was invalid because it set no time limit within which the post-suspension hearing had to be held, and it allowed the agency thirty days after the hearing within which to decide the issue.

The procedures actually used by the Department greatly minimized the risk of an erroneous deprivation of Deborah's license. There were two protracted hearings before the agency at each of which Bo Peep was afforded all of the protections which will ordinarily satisfy due process requirements in contested administrative law cases. *See* Rotunda, *supra;* Friendly, *"Some Kind of Hearing,"* 123 U.Pa.L.Rev. 1267 (1975). The record of a judicial proceeding in a circuit court was also made part of the agency record. The Department's decision was based on uncontradicted physical findings, on personal knowledge of adults concerning relevant, nonassertive conduct, on expert opinions based in part on psychologically pertinent history and, only to a degree, on hearsay declarations which would have been inadmissible as substantive evidence in a judicial proceeding. We cannot quantify the degree of the latter. In the case as a whole, however, Bo Peep does not contend that that hearsay was both so unreliable and so pervasive as to undermine the substantiality of the evidence against it.

*Rogers v. Radio Shack,* 271 Md. 126, 314 A.2d 113 (1974) on which Bo Peep relies was based on a procedural deficit of a kind not present in the instant case. In that unemployment compensation case the agency record included, and

presumably the agency considered, an investigator's report which had never been introduced into evidence at any hearing and of which the claimant was unaware. Under those circumstances, where the claimant had "no opportunity for cross-examination or rebuttal," we held that "fundamental fairness would preclude reliance upon the report by an administrative agency or a reviewing court." *Id.* at 129, 314 A.2d at 115.

The next factor to be weighed, per *Mathews v. Eldridge,* is "the probable value, if any, of additional or substitute procedural safeguards." 424 U.S. at 335, 96 S.Ct. at 903. Here that value is minimal. Bo Peep asserts that the circuit court was correct in holding that "due process of law requires that the opponent have a *meaningful opportunity* to test the credibility of out-of-hearing statements if the agency decision is foundationally based on such statements, whether or not the statements constitute hearsay." Appellee's Brief at 9–10. We observe that, strictly speaking, statements do not have credibility—witnesses do (or do not). Seemingly contradictorily, Bo Peep then submits that "the truth of the children's statements is not at the heart of the issue; the children never testified. It is the *meaning* of these statements which went untested." *Id.* at 10. Bo Peep complains that certain "persons drew conclusions from the statements made to them by the children" but that Bo Peep "was denied the right to reach behind the State's conclusions by testing the credibility of the process, thereby testing the meaning of the children's statements." *Id.*

This argument can embrace at least four possible defects affecting the "credibility of the statements." First, the content of the declarant's statement may be false. Secondly, an adult witness, either intentionally or unintentionally, may have inaccurately conveyed the declarant's statement to the decision maker. Third, the adult witness may have drawn an erroneous conclusion from the declarant's accurately reported statement. Fourth, the adult witness may have accurately communicated the declarant's statement, as far as it goes, but may have omitted other matter never

explored, or deemed by the witness to be insignificant, but which would be significant to some other evaluator.

The first possibility is that some or all of the children are lying. The authors of the article, *"Assessing the Credibility of Young Children's Allegations of Sexual Abuse: Clinical Issues," supra,* discuss the situations commonly associated with false allegations.

"Young children almost never initiate false allegations without influence from an adult. Commonly an adult, either unconsciously or consciously, is intent on proving to themselves or others that the allegations of abuse are true. The child is thus influenced by the adult to present with a false allegation. Four factors of adult influence, either individually or in combination, are most often present in fictitious stories. The mere presence of any of these factors does not mean that an allegation is false. However, in untrue stories, positive evidence linking one or more of these factors to the accusation exists. The factors of influence are:

"1. The presence of the post traumatic stress disorder in the adult.

"2. The presence of serious psychiatric disorder in a parent and evidence of a symbiotically disturbed mother-child relationship.

"3. The existence of an ongoing custody/access dispute.

"4. A professional committed prematurely to the truth of the allegation."

32 Can. J. Psychology at 611. In the instant matter Bo Peep either cross-examined or had the opportunity to cross-examine or subpoena any adult who may have influenced any child falsely to describe an occurrence at Bo Peep.

Similarly, as to the second and third possibilities, those who testified concerning statements made by the children were subject to cross-examination concerning the accuracy of their communication. The validity of the conclusions drawn by the Department's witnesses from statements made by the children were questioned by Bo Peep's expert

in psychology, Donner, who offered other explanations exculpatory of Bo Peep. Necessarily, Bo Peep was sufficiently informed of the surrounding circumstances to enable Donner to present that rebuttal.

Finally, although there was undoubtedly some risk that an adult witness might not have explored or communicated some facet of a child's life which Bo Peep's expert would consider relevant, Bo Peep had the opportunity, by cross-examination of the adult witnesses, to explore omissions by them, and Bo Peep had the opportunity to argue that omissions had invalidated the witnesses' conclusions. In sum, it appears that Bo Peep's desire to test the "credibility of statements" is a desire to discover additional data which could be used by its expert to support conclusions favorable to Bo Peep and thereby perhaps enhance the possibility that the decision maker would accept those favorable opinions. In this case that possibility is slight because of the number of children at Bo Peep who bear physical signs consistent with their having been sexually abused.

Finally, under *Mathews v. Eldridge*, we consider "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335. Here we must weigh heavily in favor of the State its interest in licensing only day care centers where children are properly cared for and, more particularly, the State's great interest in protecting children from physical and sexual abuse. Further, the State has an interest in protecting the children from further anxiety, even if there would be less emotional trauma in a psychological interview than in a cross-examination. That interest is so clear that it in part underlies Bo Peep's decision not to attempt to require the children to testify in person at the hearing. Also weighing heavily against Bo Peep's request for implementation of an additional procedure is that the requested procedure was not within the power of the hearing officer. A court adjudicating a property interest in a civil matter has no authority to compel a pretrial psychological examination

of a nonparty witness, and we would be ill advised to create that right in administrative proceedings by a fiat on constitutional grounds.

 For all of the foregoing reasons Hearing Officer Clark did not deprive Bo Peep of due process of law in denying Bo Peep's motion for a prehearing psychological interview of the allegedly abused Bo Peep enrollees.[7]

### III

The circuit court also held that the hearing officer had erred, in the suspension hearings of August 1987, by restricting the scope of cross-examination of Sergeant Joseph Swam (Swam), a witness called by the licensing agency. As a member of the Bel Air Police Department, Swam had been involved in the investigation of allegations of child abuse at Bo Peep since June 1987.[8] After eliciting Swam's background, his experience in conducting investigations and his view that, in multiple victim crimes, the investigator frequently looks for a common denominator, Swam testified that he had not identified up to that time any common denominator of the alleged victims other than Bo Peep.

Counsel for the agency then had Swam relate a conversation with Deborah in which she referred to adult members of the families of two of the alleged victims. Deborah said that the alleged victims were apprehensive, respectively, toward those adults. The information was intended to suggest that the adult family members were suspects. Objections by counsel for Bo Peep cut off Swam's describ-

---

7. Bo Peep predicates its due process argument on Maryland Declaration of Rights, art. 24, in addition to the Fourteenth Amendment to the Constitution of the United States. The two provisions are *in pari materia. See Lodowski v. State,* 307 Md. 233, 248, 513 A.2d 299, 307, *cert. denied,* 475 U.S. 1086, 106 S.Ct. 1469, 89 L.Ed.2d 725 (1986); *Sites v. State,* 300 Md. 702, 717, 481 A.2d 192, 199 (1984).

8. Swam testified, without contradiction, that he did not interview any of the children. Thus the issue before us concerning Swam's cross-examination is not involved in the due process issue discussed in Part II, *supra.*

ing how he followed up on this information. The agency proffered that it wished to show that the investigation was thorough, that the two adults consented to take polygraph examinations, which they passed, and that the police consequently excluded them as suspects. The hearing officer sustained Bo Peep's objection concerning the result of polygraph examinations. The agency was able to prove only that the police generally use polygraph examinations as an investigative tool and that they used that tool in the investigation in the instant matter.

On cross-examination counsel for Bo Peep asked, "What people have you contacted in the course of your investigation of Bo Peep?" Swam balked at answering. He claimed that he appeared as a witness with the understanding that there would be significant limitations on the scope of the questions which he would be asked. Counsel for the agency explained that Swam did not believe he could reveal details of an on-going criminal investigation. Hearing Examiner Clark referred to the confidentiality provisions of the "Public Information Act." He ruled that Bo Peep should "question this witness on the basis of the questions and answers that were given on direct examination." Counsel for Bo Peep asked if Swam had interviewed all of the employees at Bo Peep, to which Swam explained that every interview of a potential witness or suspect generates a report which becomes part of a criminal investigation file. The hearing officer again instructed Bo Peep's counsel to confine the questions to testimony brought out on direct examination. Counsel asked if Swam had interviewed all of the parents. An objection was sustained.

Swam's testimony that Bo Peep was the common denominator among the children is recited in Clark's opinion in the suspension case.

■ To the extent, if any, that Clark unduly precluded Bo Peep from testing Swam's common denominator conclusion, the assumed error is not prejudicial. When Swam had been asked whether there was any place that the children

had in common, counsel for Bo Peep objected on the ground that the question was "really ridiculous." That counsel observed that "[o]bviously he's going to say Bo–Peep," inasmuch as the universe of allegedly abused children was limited to those enrolled at Bo Peep. The hearing officer did not need Swam's opinion on investigations in order to make the common denominator fact-finding.

■■■ To the extent that Bo Peep sought to use Swam to "fish" for additional suspects, the issue is whether Clark abused his discretion in closely limiting the scope of cross-examination. *See Commission on Medical Discipline v. Stillman,* 291 Md. 390, 435 A.2d 747 (1981) (administrative agency may limit the scope of cross-examination and that decision will not be disturbed unless there has been an abuse of discretion). Bo Peep by its objections had prevented evidence of the police follow up on the "suspects" identified by Deborah. Clark was not obliged to let Bo Peep explore through Swam whether one or more other persons had, at one time or another, been the object of police attention when the matter would be left hanging, open ended, with only half of the story told. Clark had already ruled, at Bo Peep's request, that the results of polygraph tests could not be referred to as the basis for eliminating persons from suspicion. We see no abuse of discretion.

In any event, Bo Peep never proffered what its objective was in pursuing the line of interrogation of Swam. Even if Bo Peep's cross-examination had a proper objective, other than to weaken the common denominator conclusion, we have no basis from the record to conclude that the error was prejudicial in the revocation case now before us.

IV

In this part we address Bo Peep's argument that, because the State did not reinspect the Bo Peep premises as required by the regulation dealing with license renewal, the State could not revoke the license based on violations of

regulations requiring adequate supervision and prohibiting injurious treatment. We shall assume, *arguendo,* that there was no reinspection.[9]

Three days after the Board of Review of the Department of Health and Mental Hygiene had affirmed the license suspension, the Harford County Health Officer, by letter of March 26, 1988, denied Deborah's then pending application for renewal of the Bo Peep license. The reasons given for the decision were, in substance:

"1. Continued operation of Bo Peep was not consistent with the objectives of certain statutes requiring proper care, protection and supervision of children;

2. Certain regulations, not involving child abuse, had been found in the suspension case to have been violated;

3. There was a lack of adequate protection and supervision; and

4. There had been repeated instances, as found by the hearing officer, in which children were subjected to injurious treatment in violation of COMAR 10.05.01.46."

COMAR 10.05.01.46 (1988) provides:

"A child may not be subjected to treatment injurious to his physical or emotional health by a staff member or any individual connected with the center such as a substitute, volunteer, or person living in a household in which a center is licensed."

The health officer acted under the recited authority of COMAR 10.05.01.10 (1988). Subparagraph B of that regulation provides:

"B. For serious or repeated violations of any of the requirements of these regulations ... a license may be permanently revoked after an opportunity for a hearing

---

**9.** Bo Peep relies on the testimony of a Child Development Specialist for the Harford County Health Department who was told by her supervisor not to make a reinspection at Bo Peep in connection with the application for license renewal. The State does not concede a failure to reinspect. It argues that tours of the facility and reviews of documentation by state and local licensing representatives satisfy the reinspection requirement, if applicable.

has been provided by the Secretary. Before this action, the Secretary or the local health officer shall notify the licensee in writing, setting out the reasons for the action and advising the licensee that his license shall be permanently revoked at the end of 5 days following service of the notice, unless the licensee files with the Secretary a written request for a hearing within the 5–day period."

Bo Peep relies on COMAR 10.05.01.07 (1984), "Conditions and Limitations of License," which in part states that "[t]he renewal procedure for a license shall include a reinspection and re-evaluation of the center by the local health officer and appropriate authorities...." Because the revocation of Bo Peep's license procedurally was initiated by a refusal to renew, Bo Peep argues that 10.05.01.07 is applicable and further reads the reinspection requirement as a condition precedent to revocation.

The State argued to the circuit court that 10.05.01.07 did not circumscribe the Department's authority to revoke where the grounds were inadequate supervision and injurious treatment. The circuit court, however, in view of its finding of a due process violation, ordered that the further proceedings on remand include reinspection.

We have held that the agency hearing did not violate due process so that the issue before us is purely one of interpretation of the regulations. The primary purpose of the regulation requiring reinspection is to protect children, by insuring that requirements determinable on inspection had been met. By way of illustration, these requirements would seem to include the nature and condition of the physical plant and of the equipment, including food service capacity, and required record keeping. The reinspection requirement may well additionally operate as a protection to a licensee against a refusal to renew on a ground which reinspection would reveal does not exist. But none of those purposes has any relationship to the grounds relied upon by the Department for the revocation or nonrenewal of Bo Peep's license. It was not the intent of the reinspection

regulation that an inspector must observe child abuse on a reinspection before a license can be revoked by nonrenewal based on child abuse demonstrated circumstantially.

## V

Bo Peep's final assertion is that the hearing officer, Clark, should have recused himself in the revocation case. The circuit court held that Clark had not abused his discretion by deciding to proceed. Bo Peep's point is that Clark, on the first day of the revocation hearings, had admitted into the record the transcript of the suspension case and a copy of his findings and conclusions as hearing officer in the suspension case. Bo Peep argues that, because all of the violations alleged in the revocation case involved events antedating mid-July 1987, and because all of the violations found in the suspension case involved that same period, Clark could not impartially decide the revocation case issues.

Clark's admission of the suspension case transcript into the revocation case record does not demonstrate actual bias. In the circuit court Bo Peep argued that Clark erred in admitting that transcript but that court rejected the argument. In this Court Bo Peep does not directly assert that Clark erred in admitting the transcript. Instead, Bo Peep argues lack of impartiality and cites the same ruling. Under COMAR 10.05.01.10B (1988) the standard for imposing the sanction of permanent revocation of a license is "serious or repeated violations of any of the requirements of [the] regulations...." Clark appropriately included in the revocation case the record underlying those violations found in the suspension case for the consideration of the Secretary's designee in determining whether permanent revocation was appropriate.

Applicable here is the rule stated in *United States v. Grinnell Corp.*, 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778, 793 (1966):

"The alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case."

This Court most recently gave recognition to the above rule in *Doering v. Fader,* 316 Md. 351, 558 A.2d 733 (1989) which cites many cases to the same effect as *Grinnell.* We have also said that the rule applies to administrative agencies. *See Board of Medical Examiners v. Steward,* 203 Md. 574, 102 A.2d 248 (1954) (members of a hearing board who initially participated in the decision of a case which was appealed and remanded to the agency were not thereby disqualified from hearing the matter on remand).

Accordingly, we reverse. We shall, however, assess costs against the State. This is because the State devoted substantial portions of its briefs in chief and in reply to arguing the substantiality of the evidence, despite the fact that neither the circuit court nor Bo Peep has questioned the revocation order on that ground.

JUDGMENT OF THE CIRCUIT COURT FOR HARFORD COUNTY REVERSED. CASE REMANDED TO THAT COURT FOR THE ENTRY OF A JUDGMENT AFFIRMING THE FINAL DECISION DATED AUGUST 31, 1988, OF THE SECRETARY, DEPARTMENT OF HUMAN RESOURCES, WHICH AFFIRMED THE DECISION OF THE HARFORD COUNTY HEALTH OFFICER TO REVOKE THE LICENSE OF BO PEEP DAY NURSERY. COSTS TO BE PAID BY APPELLANT.