827 A.2d 910

**Marvin Clark WEBSTER**

v.

**STATE of Maryland.**

**No. 2508, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

June 27, 2003.

---

528

Brian J. Murphy, Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for appellant.

Sarah Page Pritzlaff, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for appellee.

Argued before HOLLANDER, KENNEY, ADKINS, JJ.

ADKINS, Judge.

In this appeal from a child sexual assault conviction, we must decide whether a four-year old victim's description of the assault communicated to a nurse trained in Sexual Assault Forensic Examination ("SAFE") was admissible under Md. Rule 5–803(b)(4), the hearsay exception covering statements made "for purposes of medical diagnosis or treatment." We shall hold that it was, even though there were dual medical and forensic purposes for the challenged statement.

## FACTS AND LEGAL PROCEEDINGS

On the evening of August 6, 1999, Evelyn Francis hosted a "safe sex" meeting sponsored by the health department. Children of the guests and Francis' four-year old daughter, Tiarah E., heard the ice cream truck, got money from their parents, and went to get snowballs. Tiarah dropped hers. Neighbor Joy Reid told her to go into her apartment and get an icee out of the freezer. Tiarah went into Reid's apartment unattended.

While in the apartment, Tiarah used the bathroom. Tiarah reported that she was seated on the toilet when a strange man came into the bathroom. According to Tiarah, the man licked her "tu-tu all the way inside." She asked him to stop, but "he keeped on and keeped on." Francis explained that "tu-tu" or "do-do" was her daughter's name for her vagina.

When Reid came inside looking for Tiarah, she saw Tiarah with Webster, whom she recognized as an occasional companion of Reid's mother. Webster was touching Tiarah's pants.

Reid took the crying child to her mother. Reid and Francis returned to Reid's apartment with the child. There, Reid beat Webster with a broom, and Francis threw a beer bottle at him. Webster then fled the apartment building.

Police arrived shortly after the incident. The first officer on the scene was Deputy First Class Dawn Wolf of the Harford County Sheriff's Office. Wolf spoke with Tiarah, Francis, and Reid. She and Francis then took Tiarah to Fallston General Hospital, where they were met by Corporal Michael Crabbs, a detective with the Harford County Sheriff's Child Advocacy Center.

The hospital had staff doctors and nurses trained to conduct sexual assault forensic examinations. SAFE nurse Linda Holden interviewed Tiarah before she and SAFE physician Dr. Steven Bentman examined the child. Tiarah told Holden "that a man that she didn't know had licked her do-do and she told him not to and he said he was going to keep on doing it."

Crabbs met with Webster three days after the incident. On August 9, 1999, Webster walked into the police station and

asked if there was any "paperwork" for him. The officers on duty said no, then contacted Crabbs. Crabbs asked Webster if he would voluntarily meet with him. Webster told him that he would be "more than happy to come in and talk" about the incident. During the ensuing interview, Webster gave a recorded statement, a transcript of which was admitted into evidence at trial. He left after the interview.

Six days after the incident, Crabbs interviewed Tiarah along with licensed clinical social worker Kimberly Parkes–Bourn. A videotape of that interview was played for the jury.[1] Tiarah acknowledged that she had met Crabbs "at the hospital .... [w]hen I had a needle." She showed her interviewers the needle mark on her arm.

Parkes–Bourn asked what Tiarah talked to Crabbs about at the hospital. She replied, "I was talking about that man that licked me on my tu-tu." She explained that he was "a stranger" who was at Reid's home "[w]hen Joy told me to get an icee."

Ms. Parkes–Bourn: At Joy's house? And there was a man at Joy's house?

[Tiarah]: Yeah. And there was a stranger. He licked me. When Joy came and saw it. I asked him—I asked her where he did it and she—and she start the whipping. When I was in the bathroom, when I had to use the bathroom a man came beside me, he turned off the light, he closed the door.

Ms. Parkes–Bourn: When you were in the bathroom?

[Tiarah]: Yeah.

Ms. Parkes–Bourn: He turned off the light and closed the door. Where did this happen?

[Tiarah]: At Joy house. And I was screaming.

---

1. This videotape was admitted without objection. We express no opinion on the question of whether it would have been admissible over a timely objection.

Ms. Parkes–Bourn: You were screaming?

[Tiarah]: Yeah.

Ms. Parkes–Bourn: What happened after the lights were turned off and the door was closed?

[Tiarah]: I turned them back on and he was going to sleep. I went out the door.

Ms. Parkes–Bourn: Okay. You said that he came in when you were going to the bathroom?

[Tiarah]: Yes, when I had to use the bathroom. He licked it all inside.

Ms. Parkes–Bourn: He—he licked what?

[Tiarah]: My tu-tu all the way inside. He pulled down my stuff and he licked it all the way down.

Ms. Parkes–Bourn: And this was when the lights were off in the bathroom and the door was closed?

[Tiarah]: No. The light was off and the door was not closed. The door was open.

Ms. Parkes–Bourn: The door was open?

[Tiarah]: And he keeped on and keeped on. When he was bending down he did that.

Ms. Parkes–Bourn: When he was bending down?

[Tiarah]: And he put his chin next to me. Then he licked it.

As the interview proceeded, Tiarah said that the assault occurred in various other locations, including the living room, hallway, patio, and even her own home. Her description of what happened that day became increasingly confused. Among other things, she said that her assailant "snatched my toys" and "swallowed" one until his throat was "cut off," that he "peed on [m]y head and I changed my head," that "[h]e broke my fingers" but "my mommy fixed it," that he "put his finger in my mouth" and it was broken, and that "his whole body was burned." She also described "[a] different stranger" who "digged his finger in my tu-tu" and "bit my nail off," and "another stranger coming across the lake, . . . a stranger boy" who "was trying to grab me" and "put me in the water," but "I changed my clothes and he peed on me."

In October, Crabbs received notice from the crime lab that "amylase," which is an indicator for human saliva, had been detected on the inside crotch of Tiarah's underpants and on one of two labial swabs. At trial, serologist Argiro Magers testified that only saliva would generate the dark blue hue that appeared when Tiarah's labial swab and underpants were tested. Amylase may be present in smaller amounts in other body fluids, including gastrointestinal fluids, but Magers could not say whether saliva present in vomit would produce a similar hue.

Subsequent DNA testing showed that the same underwear tested positive for mixed DNA from two people. When the police could not locate Webster, they obtained a warrant for his arrest. The FBI arrested Webster on that warrant in July 2000. At that time, Webster's blood and saliva samples were taken. Based on the those samples, a Maryland State Police crime lab technician concluded that

> it was 1.1 million times more likely that this mixture origi-nated from Tiarah ... and Marvin Clark Webster than from Tiarah ... and one unknown individual in the Caucasian population and is 3.7 million times more likely to have originated from Tiarah ... and Marvin Clark Webster than from Tiarah ... and one unknown individual in the African–American population.

At trial, Webster testified in his own defense. He denied putting "his mouth or tongue on Tiarah['s] private parts." He told the jury that after work, he drank three beers and most of a pint of gin, then went to visit Reid's mother. He drank more beer and they had sex. After Reid's mother left, Webster felt sick. He vomited, urinated, and defecated in the bathroom, then returned to the bedroom. When he came out, he saw a little girl standing in the doorway of the bathroom. Observing that the child's shorts were "twisted," he "gave her a hand twisting them back around correctly." The child pointed toward the door, saying "green ice cream." Webster gave her some change. At that point, Reid came in and "just started going off." To escape from Reid and Francis, Web-ster fled the apartment building.

A jury in the Circuit Court for Harford County convicted Webster of a second degree sex offense. Webster noted this appeal.

## DISCUSSION

Webster asks us to reverse his conviction for two reasons:

I.  The trial court erred in admitting statements that Tiarah allegedly made to a SAFE nurse, to the effect "that a man that she didn't know had licked her do-do and she told him not to and he said he was going to keep on doing it."

II. The trial court erred in giving a curative instruction, rather than granting a mistrial, after it allowed the jury to hear an inadmissible statement by the child to a police officer.

We find no reversible error in the decision to admit Tiarah's statement to the SAFE nurse, and no abuse of discretion in the denial of a mistrial.

### I.

### Admissibility Of Tiarah's Statements To The SAFE Nurse

#### A.

### Hearsay Exception For Statements In Contemplation Of Medical Diagnosis Or Treatment

Under Md. Rule 5–803(b)(4), certain statements made for purposes of medical diagnosis or treatment are admissible as exceptions to the rule against hearsay:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness: ... Statements made for purposes of medical treatment or medical diagnosis in contemplation of treatment and describing medical history, or past or present symptoms, pain, or sensation, or the inception or general character of the cause or exter-

nal sources thereof insofar as reasonably pertinent to treatment or diagnosis in contemplation of treatment.

"The rationale behind this exception is that the patient's statements are apt to be sincere and reliable because the patient knows that the quality and success of the treatment depends upon the accuracy of the information presented to the physician." *In re Rachel T.,* 77 Md.App. 20, 33, 549 A.2d 27 (1988); *see Low v. State,* 119 Md.App. 413, 418–19, 705 A.2d 67, *cert. denied,* 350 Md. 278, 711 A.2d 870 (1998). The exception specifically contemplates the admission of statements describing how the patient incurred the injury for which he is seeking medical care. For example, "if the doctor needed to know the source of the injury in order to determine treatment ..., the patient's statement as to source should be admissible, particularly if the doctor told the patient that the information was necessary for proper treatment." 6A Lynn McClain, *Maryland Evidence* § 803(4):1, at 218 (2d ed.2001)(collecting cases).

■ The rationale underlying this firmly rooted hearsay exception " 'extends to statements made in seeking medical treatment from others such as nurses[.]' " *Choi v. State,* 134 Md.App. 311, 321, 759 A.2d 1156 (2000)(quoting McClain). But the "need to know" premise for the exception means that it does not extend to statements made to nontreating medical personnel. In *Maryland Dep't of Human Resources v. Bo Peep Day Nursery,* 317 Md. 573, 589, 565 A.2d 1015 (1989), *cert. denied,* 494 U.S. 1067, 110 S.Ct. 1784, 108 L.Ed.2d 786 (1990), the Court of Appeals explained why statements made to treating medical personnel fit within this exception, but those made to medical providers who merely examine a sexual assault victim do not. "Under the law of evidence, as a general proposition, statements of medical history, made by a patient to a treating medical practitioner for the purpose of treatment, may be admitted as substantive evidence through the medical witness." *Id.* at 589, 565 A.2d 1015 (citations omitted). "Consequently, statements made to a nontreating physician, such as an expert preparing for an upcoming trial,

are not admissible as substantive evidence[.]" [2]  *In re Rachel T.,* 77 Md.App. at 34, 549 A.2d 27.

■    For this reason, courts must separately examine both the reason that a medical provider asked the sexual assault victim to describe the assault, and the victim's subjective purpose in making the statement.  *See id.* at 33–34, 549 A.2d 27.  Only statements that are both **taken and given** in contemplation of medical treatment or medical diagnosis for treatment purposes fit within the Rule 5–803(b)(4) hearsay exception.  *See id.; Cassidy v. State,* 74 Md.App. 1, 27–50, 536 A.2d 666, *cert. denied,* 312 Md. 602, 541 A.2d 965 (1988).

### B.

### Tiarah's Statement To The SAFE Nurse

Just before SAFE nurse Linda Holden testified, defense counsel questioned whether Tiarah's statements to her fit within this exception.  In response, the trial court ordered a brief *in limine* hearing in which Holden was examined outside the presence of the jury "to see whether . . . part of her testimony is admissible under Rule 5–803(b)(4)."  The court noted specifically that it needed "some qualifying testimony" regarding "exactly what was going on in the taking of the rape kit and the presentation of this child[.]"

On direct examination, Holden explained that "a SAFE nurse is . . . a registered nurse with emergency training and critical care training who then goes on to take other classes regarding the collection of evidence for sexual assault patients."  The prosecutor then asked Holden about the proce-

---

**2.**  But a doctor who examines a patient in order to qualify as an expert witness can testify about "information . . . received from the patient which provide[s] the basis for the conclusions" about which he testifies. *Beahm v. Shortall,* 279 Md. 321, 327, 368 A.2d 1005 (1977).  The conclusions are "admissible as substantive evidence." *Id.*  The statements to the physician "are admissible, with a qualifying charge to the jury, only as an explanation of the basis of the physician's conclusions and not as proof of the truth of those statements." *Id.  See Cassidy v. State,* 74 Md.App. 1, 43, 536 A.2d 666, *cert. denied,* 312 Md. 602, 541 A.2d 965 (1988).

dures for patients who come to the emergency room reporting a sexual assault.

[Holden]: The procedure is that first the patient would have to be medically cleared. In other words, we would have to look at them for injuries or medical problems. Then once they are cleared by a physician regarding their status medically, then the sexual assault nurse is called in to do an evidence collection exam and to treat or look for sexually transmitted diseases and treatment against them.

The Court: Treat or look for?

[Holden]: Sexually transmitted diseases and we prophylactically treat them, give antibiotics for that.

[Prosecutor]: In what manner do you examine whether ... she has a sexually transmitted disease?

[Holden]: We do a test for syphilis, which is a blood test. We send that to our lab in the hospital. We do vaginal swabs for gonorrhea and chlamydia.

[Prosecutor]: .... [Y]ou take a history from your patients?

[Holden]: Right.

[Prosecutor]: What is the portion of that history dealing with sexually transmitted diseases?

[Holden]: Well, initially when they give a history you are looking for injuries and so on. In the SAFE nurse's case, when we take a history, we are looking for any mechanism of injury and also we're looking for ... what evidence we should be trying to take from the victim....

[Prosecutor]: In what manner would a history by a patient help you in treatment?

[Holden]: **Well, basically patients who are traumatized don't always feel pain as early as they might. They could have an injury that would be hidden that they wouldn't be able to tell us about. So, we ask a lot of questions around the mechanism of what happened to them so that we know what to look for. We might need to do an x-ray. They are not feeling any pain, we could find a hidden injury, an internal injury that they don't even know they have. So, we have to get a history to**

**find out what happened to them basically so that we know what to look for to take care of them.** (Emphasis added.)

The prosecutor then questioned Holden about Tiarah's examination.

[Prosecutor]: What treatment did Tiarah ... have in this case?

[Holden]: As I remember, the only actual treatment that Tiarah had was that we collected evidence from her and we did sexually transmitted disease testing for her. I don't recall any other treatment for her.

[Prosecutor]: In what manner was she tested for sexually transmitted diseases? What did you have to do in order to do that?

[Holden]: Well, I drew [blood] from her which I sent to the lab and we tested for syphilis. The physician took some swabs from around the vaginal area that we tested for gonorrhea and chlamydia.

On cross-examination, defense counsel questioned Holden about the test kit and forms used in the examination. Holden acknowledged that the standard rape and sexual assault kit included a "physical examination and collection of evidence, rape and sexual assault form[.]" She also acknowledged that, in addition to information regarding the physical condition of the patient, this form included certain questions "basically related to evidence collection," including whether the patient had showered or urinated, because "that would tend to show that evidence might not otherwise be there." The form also featured a checklist of evidence sent to the police laboratory, an authorization to collect physical specimens during physical and gynecological examinations, and another authorization to transmit copies of medical and lab reports to the police.

Other questions on the form had both an evidence preservation and medical purpose. For example, if responses to "general appearance" questions indicated bloody or torn clothing, Holden "would be looking for an injury[,]" because "sometimes patients don't know that they have an injury."

Defense counsel then asked Holden about the medical examination that is performed before she interviews the patient.

[Defense Counsel]: And you see them after the doctor has already seen them for the purpose of treatment?

[Holden]: I see them after the doctor has had a brief initial exam, yes. The doctor sees them again after I see them, too. . . . [I]n the case of children, the SAFE nurse does not do the vaginal swabs. That is only in the case of adults. . . . When it is children the physician actually does it and we just assist him, accompany and assist him. . . .

[Defense Counsel]: So, Tiarah had already been seen by a doctor?

[Holden]: The routine is that the physician sees sexual assault patients briefly to determine whether there is a medical problem that would take precedence over doing an evidentiary exam. In other words, if they were highly physically traumatized and they had take care of something medical first. It is a brief exam. **They don't really do a physical exam particularly, they just go in and talk to them to see how they are doing and then they tell us to come in.**

[Defense Counsel]: And do the evidentiary exam is what you're saying?

[Holden]: Yes.

On re-direct, Holden clarified that the medical care and interview that takes place before the SAFE examination is limited to treatment of "major medical problems" and "major trauma."

As a routine, the patient comes in and they see an Emergency Room nurse who is considered a primary care nurse and they do the initial assessment; the initial vital signs, the weight, the height, blood pressure, pulse, all of that, history of medications and allergies and medical problems. **They ask some very brief questions in terms of just finding out again if we have a major medical problem or major trauma to deal with. They don't ask very much related to the actual assault.** Then the physician sees the

patient and looks at how they are and whether or not they are able to undergo this exam. Then they call us and we come in and ... interview the patient again regarding what happened and the mechanism of what happened so that we can again catch any possible injuries that could have occurred and then we do an evidence collection exam. But we also do some medical things, too, looking for the sexually transmitted diseases and that sort of thing. If we have reason, ... we have some orders that include how to care for injuries and prophylaxis against sexually transmitted diseases and that sort of thing. Since we are nurses, we do go ahead and take care of that part of things, too. (Emphasis added.)

Tiarah's medical chart showed that the examinations of Tiarah followed this standard procedure. She went from a triage nurse, who took an initial brief history, vital signs, height, and weight, into a room in the emergency department, where a primary care nurse assigned to her took "a quick look." Then the ER physician assessed that there was no medical treatment necessary before the SAFE examination, and that Tiarah could tolerate that examination. If, for example, the doctor had determined that Tiarah needed stitches or x-rays, that treatment would have occurred before the SAFE examination. Finding none necessary, "they call[ed] the SAFE nurse[.]"

Holden and Dr. Bentman performed a pelvic exam. Holden explained that there was an important medical reason for the SAFE team to perform that medical procedure:

In order to check for a STD you have to do a cervical swab. If they do that cervical swab before [the SAFE nurse and doctor] come in[,] this poor patient is exposed twice to having a pelvic exam, which is an invasive exam and not a lot of fun. So, we try to do it only one time.

Holden also explained how Tiarah's statement about the incident was relevant to her medical diagnosis and treatment.

Basically she told me that she was on her way with some other friends to get a snowball and that she stopped in the

apartment of a friend in their building. She was using the bathroom and that a man whom she didn't know had come in and began to lick her tu-tu or her do-do I believe she called it to me. I needed to ask her what she meant by do-do and she pointed to her vaginal area. So, my treatment for her would be that that would be what we would look at in terms of the transmission ·of a sexually transmitted disease and in terms of where we would collect evidence, too. We would be looking at taking underwear and taking labial swabs.

Finally, Holden recounted that Tiarah also made a similar statement to the triage nurse.

[W]hen the triage nurse called me, I was told that she told the triage nurse that a man had licked her tu-tu. Whether they wrote it or not, I'm not sure. The triage nurse actually writes in the chart that the mother stated that the child was licked in the vaginal area, but the information that I had from the triage nurse was that the child has been licked in the vaginal area.

Defense counsel argued that Holden's testimony and notes about Tiarah's description of the incident should not be admitted under the medical diagnosis or treatment exception because Holden had no treatment role. He characterized the prosecution's claim that there was "some small amount of medical activity" as "exaggerations" designed "to try to give [the SAFE exam] a medical bent[.]"

The prosecutor pointed to evidence that Holden was present and actively assisted Dr. Bentman while he performed the pelvic exam, and that they took blood and swabs that were tested for venereal diseases. Nevertheless, she conceded that Holden's testimony established that there was "a dual purpose" for the SAFE examination, and that Holden was acting as both a nurse and a forensic examiner, "to take care of her patient" and "to collect evidence."

The prosecutor also argued that Tiarah, like any sexual assault victim, was "there for treatment" and "could [not] have contemplated that the making of those statements was for

prosecution purposes." She pointed out that Tiarah described her experience at the hospital in medical terms, commenting in her videotaped interview that she went to the hospital to get "a needle." Moreover, there was no other reason for Tiarah "to believe that any statement that she made and any action taken by a nurse or a physician as a result of that statement [was] going to be used in a court of law later on[.]"

The trial court ruled that Holden's testimony and medical records about Tiarah's description of the incident were admissible.

Having heard Ms. Holden testify, the [c]ourt finds that it does fit within the exception.

**You can have more than one purpose for the exam.** In this case what I have been hearing is you have the triage nurse who is doing triage, coming in and taking a look and saying ... where are we in the priority of treating this person, do we need to stop bleeding or take care of [other] things. You then have the doctor that takes a cursory look and then we bring in the SAFE nurse who also takes a look for the purposes of treating the injuries. As I think she alluded to, somebody can be in shock or upset, ... and they are not aware that they have broken bones or internal injuries, ... and they are taking the further information.

Very strongly throughout this is, of course, the issue of diagnosing for the STD.... [Y]ou can have your ribs fractured and internal organs bruised and everything else and, of course, the most serious that can be dealt to you is the transmission of a sexually transmittable disease....

So, frankly that is a very critical part of administering care in a sexual assault case. That is the function of this nurse. **The mere fact that they are also helping from a forensic standpoint doesn't negate the medical portion that they are playing. In this case [the hospital] policy is, rather than a nurse tak[ing] the actual swab, she calls the physician in to do it and she assists. That doesn't change anything from what she is doing when she obtains the statement.**

So, the [c]ourt finds that this easily fits within [the exception] and ... will deny the [d]efendant's objection to that statement coming in. (Emphasis added.)

## C.

### Admissibility Of Dual Purpose Statement

■ "When the prosecution attempts to offer hearsay evidence against a defendant, the trial judge must determine (1) whether the State has satisfied the foundational requirements of a recognized exception, and (2) if so, whether the admission of this hearsay statement would violate the defendant's right of confrontation." Joseph F. Murphy, Jr., *Maryland Evidence Handbook* § 705(B), at 278 (3d ed.1999); *see Gregory v. State*, 40 Md.App. 297, 323–24, 391 A.2d 437 (1978), *cert. denied*, 471 U.S. 1103, 105 S.Ct. 2333, 85 L.Ed.2d 849 (1985). This Court has applied the treating-examining distinction under Md. Rule 5–803(b)(4) in cases featuring circumstances similar to some of the circumstances present in this case.

In *Choi v. State*, 134 Md.App. 311, 322, 759 A.2d 1156 (2000), we recognized that statements describing an assault, when made immediately after the incident to emergency medical personnel such as paramedics, may qualify as statements for medical diagnosis and treatment purposes. In *Cassidy* and *In re Rachel T.*, we observed that one important reason for a sexual assault examination is to determine whether the victim contracted a sexually transmitted disease. *See In re Rachel T.*, 77 Md.App. at 36, 549 A.2d 27; *Cassidy*, 74 Md.App. at 34 n. 14, 536 A.2d 666.

Webster challenges whether a statement describing a sexual assault, made during a physical examination that was conducted for dual forensic and medical purposes, is admissible under Rule 5–803(b)(4). Neither the Court of Appeals nor this Court has answered this question.

In *Low v. State*, 119 Md.App. 413, 426, 705 A.2d 67 (1998), *cert. denied*, 350 Md. 278, 711 A.2d 870 (1998), the trial court decided that such a dual purpose statement was admissible,

but we reversed on other grounds. In that case, a social worker referred a 12 year old girl to a Department of Health and Human Services physician. After examining the child, the doctor concluded that no medical treatment was necessary. A majority of the panel held that the trial court erred in finding that the physician was both a treating and an examining physician. *See id.* at 422–26, 705 A.2d 67. "[G]iven the specific facts in this case, we can reach no other conclusion except that [the doctor] saw [the victim] for the sole purpose of examining and detecting child abuse." *Id.* at 425, 705 A.2d 67.

We therefore did not address the "dual purpose" question that we would have been required to resolve if there had been some medical purpose for that examination. In dissent, Judge Alpert cited evidence that the child was tested for STDs and referred for mental health counseling, and concluded that the trial court did not err in permitting the doctor to testify as both an examining and treating physician. *See id.* at 436, 705 A.2d 67.

Webster disagrees that a physician who wears two hats during an examination also may wear those same two hats on the witness stand. In Webster's view, the predominant purpose for the procedure should prevail, and Tiarah's statement to Holden was not admissible because "the primary purpose of the examination . . . was the recovery and preservation of evidence of sexual assault to be used in court."

■ We agree with the State and the trial court that a sexual assault victim's statement describing the assault may be admissible under Rule 5–803(b)(4), even though it was taken and given for dual medical and forensic purposes. The rationale for admitting this type of hearsay—that statements in contemplation of medical diagnosis or treatment are inherently reliable—may still exist in such circumstances. If the challenged statement has some value in diagnosis or treatment, the patient would still have the requisite motive for providing the type of "sincere and reliable" information that is

important to that diagnosis and treatment. *See In re Rachel T.,* 77 Md.App. at 33, 549 A.2d 27.

This rationale applies in the context of this case, when a hospital nurse trained in both emergency care and sexual assault forensic examination treats and forensically examines a child immediately following a sexual assault, and in doing so solicits a description of the incident. In these circumstances, the victim's statement may be "pathologically germane" to any injury or disease that the victim may have suffered in the assault. *Cf. Marlow v. Cerino,* 19 Md.App. 619, 635, 313 A.2d 505 (1974)(the term "pathologically germane" "means having sufficient bearing upon and relation to the disease or injury from which one suffers"). As nurse Holden's testimony illustrates, what happened to a sexual assault victim may be critically important in deciding where to examine her, what range of medical problems to look for, and, ultimately, how to treat her.

We hold that the trial court correctly concluded that the existence of dual medical and forensic purposes for Tiarah's statement that a stranger had "licked her tu-tu" did not disqualify the statement for admission under Rule 5–803(b)(4). In these circumstances, "the inception or general character of the cause" may still be "reasonably pertinent to treatment or diagnosis in contemplation of treatment." Md. Rule 5–803(b)(4). *See generally* Tracy A. Bateman, Annotation, *Admissibility of Statements Made for Purposes of Medical Diagnosis or Treatment as Hearsay Exception Under Rule 803(4) of the Uniform Rules of Evidence,* 38 A.L.R.5th 433 § 3a (updated May 2003)(collecting cases); Robert P. Mosteller, *Children as Victims and Witnesses in the Criminal Trial Process: The Maturation and Disintegration of the Hearsay Exception for Statements for Medical Examination in Child Sexual Abuse Cases,* 65 Law & Contemp. Prob. 47 (2002)(symposium examining and drawing lessons from cases interpreting this hearsay exception; author advocates required showing of medical pertinency, that declarant is aware of selfish treatment interest in accuracy, and other factors indicating trustworthiness).

Our holding is consistent with decisions in other jurisdictions approving the admission of hearsay statements by a sexual assault victim when there were dual medical and forensic purposes for the examination. *See, e.g., Maine v. Hebert,* 480 A.2d 742, 748 (Me.1984)(physician's understanding that medical diagnosis from examination was potentially helpful to State's case did not detract from its medical nature; nor did declarant's awareness that criminal proceedings might be instituted on the basis of the examination detract from its trustworthy nature); *Minnesota v. Bellotti,* 383 N.W.2d 308, 312 (Minn.Ct.App.1986), *overruled in part on other grounds by Minnesota v. Dana,* 422 N.W.2d 246, 250 (Minn.1988)(physician's interview of four year old before sexual assault examination allowed her to obtain idea of what specific sexual contact may have occurred, "and to build trust between doctor and child to minimize trauma" of the ensuing physical examination); *State v. White,* 145 N.H. 544, 765 A.2d 156, 163–64 (2000), *cert. denied,* 533 U.S. 932, 121 S.Ct. 2557, 150 L.Ed.2d 722 (2001)(no error in admitting statement made to emergency room physician when police brought children to hospital shortly after sexual assault because victims understood there were medical reasons for the dual purpose examination); *North Carolina v. Isenberg,* 148 N.C.App. 29, 557 S.E.2d 568, 574–75 (2001), *cert. denied,* 355 N.C. 288, 561 S.E.2d 268 (2002)(no error in admitting statements made to hospital nurse and physician who had dual medical and forensic purposes for examination and interview); *State v. Janda,* 397 N.W.2d 59, 63–64 & n. 4 (1986)(no error in admitting statement made to hospital nurse on duty when victim arrived for examination because "the purpose of an examination of the kind involved here is not just the preservation of evidence, but diagnosis and treatment as well"); *Ohio v. Goins,* 2001 WL 1525298, 2001 Ohio 8647, 1001 Ohio App. LEXIS 5329, *16–17 (2001)(no error in admitting statement made to doctor during interview that "served dual purposes" of diagnosis/treatment and investigation); *Torres v. Texas,* 807 S.W.2d 884, 886–87 (Tex.Ct. App.1991)(no error in admitting statements made to emergency room nurse who "engaged in a dual role of collecting

evidence and providing medical service"); *Hughbank v. Texas,* 967 S.W.2d 940, 943 (Tex.Ct.App.1998)(no error in admitting statements made to doctor during rape examination because information assisted in diagnosis and treatment, even though doctor admitted he was both providing treatment and collecting evidence); *cf. Owen v. Wyoming,* 902 P.2d 190, 195–96 (Wyo.1995)(statements describing sexual assault were admissible when purpose of taking information about what happened was to focus physician's attention on certain organs); *Sharp v. Kentucky,* 849 S.W.2d 542, 544–45 (Ky.1993)(psychiatrist's testimony about sexual abuse report from six and seven year olds was inadmissible because psychiatrist was not a treating physician, having been hired by social services to evaluate potential sexual abuse).

■ Nevertheless, our conclusion that a statement taken for dual medical and forensic purposes may be admissible does not finally answer whether Tiarah's statement was properly admitted. To resolve that question, we must review the trial court's factual findings that Tiarah's statement was both taken and given in contemplation of medical diagnosis or treatment, to determine whether there was sufficient evidence to support those findings. As we explain in the next two sections, we conclude that there was.

### D.

### Taken For Medical Diagnosis Or Treatment

Webster wisely concedes that there was a medical reason for nurse Holden's examination of Tiarah and the interview that preceded it. The trial court was entitled to accept Holden's clearly articulated medical reasons for asking Tiarah what happened. In particular, the trial court cited Holden's testimony that a sexual assault victim may have internal injuries or may have contracted a venereal disease, even though she feels no pain and bears no external signs of injury during the brief initial physical examination for "major medical problems[.]" Alternatively, she might be so traumatized that her pain is masked, or that she initially fails to report all

the information that a nurse or physician would consider relevant in determining what examination, testing, and treatment is indicated.

Here, Tiarah's report that she had been licked undisputedly established an STD risk, and therefore the need to test for STDs, and, pursuant to hospital protocol, the need to conduct a single pelvic examination during which diagnostic tests were performed. Moreover, Holden invited Tiarah only to tell what happened, not to identify her assailant.

There was ample evidence that Holden elicited Tiarah's description of the assault "in contemplation of" diagnosing and treating Tiarah for any latent injury that she may have suffered, or any sexually transmitted disease that she may have contracted. We find no error in the trial court's conclusion that Holden had valid medical reasons for eliciting Tiarah's account of the sexual assault.

### E.

### Given For Medical Diagnosis Or Treatment

In contrast, Webster does challenge the trial court's finding that Tiarah had a medical reason for describing the assault. He contrasts what Tiarah was told about the SAFE examination with what the four year old victim in *In re Rachel T.* was told. In that case, Rachel's parents took her to her pediatrician when they found blood on her panties and in the toilet. The pediatrician referred Rachel to a pediatric gynecologist. When Rachel became upset before the examination, a social worker in the gynecologist's office told the child "that the reason for [the doctor's] examination and questions [is] 'because we were worried and wanted to see why there had been blood in her panties and in the toilet.'" *In re Rachel T.,* 77 Md.App. at 35, 549 A.2d 27. Webster emphasizes that there was no comparable evidence that Tiarah was told about the medical reason for the examination and questions.

We agree that this record does not contain any indication that nurse Holden gave Tiarah a comparable medical explana-

tion for the SAFE examination. But we disagree that such an explicit statement is necessary in every case. Although telling a patient that the information she provides will help in diagnosis and treatment would support the admissibility of responsive statements, circumstantial evidence also may provide an adequate evidentiary foundation for admitting the statement. *See* McClain, *supra*, § 803(4):1, at 218. Thus, our task is to determine whether circumstantial evidence supported the trial court's conclusion that Tiarah understood the medical purpose for the examination and questions, and that she told Holden what happened in contemplation of medical diagnosis and treatment.

Webster cites Tiarah's age and her rambling videotaped statement as reason to conclude that she did not. He compares Tiarah to the two year old abuse victim in *Cassidy*. There, we found that the child lacked both a concerned physical self-interest and an ability to understand the medical reason for why she was being interviewed. *See Cassidy*, 74 Md.App. at 29–30, 536 A.2d 666. Because such knowledge lies "at the very core of this particular evidentiary theory," the child's statements that "Daddy did it" were not admissible. *See id.* at 30, 536 A.2d 666. In Webster's view, the record here was similarly insufficient to establish that Tiarah was motivated to truthfully report what happened in order to obtain medical treatment.

The State counters that four year old Tiarah "could hardly be said to have been anticipating a future prosecution when she explained to Nurse Holden what had just happened to her." But this argument begs the material question; even if Tiarah did not understand the prosecutorial reason for the examination, that **lack** of understanding does not necessarily show that she affirmatively understood the medical reason for it, or the corresponding need to provide truthful information. For the reasons that Judge Moylan thoroughly explained in *Cassidy*, the State, as the proponent of Tiarah's hearsay statement, had the burden of presenting evidence that Tiarah subjectively believed that her account of the assault would

help the hospital nurses and doctors in their efforts to diagnose and treat her. *See id.*

The trial court's task was to assess all of the evidence bearing on why Tiarah told nurse Holden that she had been licked. The court was obligated to consider any evidence relevant to whether the child made this statement for some reason other than to give Holden information that would help her to determine the need for medical care. Here, the court considered evidence of Tiarah's age and ability to understand why nurse Holden was asking what happened to her. It also considered evidence of Tiarah's ability to accurately recall and describe the assault, including the videotaped interview, as well as the child's experiences with the police and at the hospital in the short time between the incident and Holden's interview.

Having heard all this evidence, the court determined that Tiarah gave nurse Holden her simple account of what had happened for a medical reason, and implicitly exercised its discretion to admit that evidence as more prejudicial than probative. *See* Md. Rule 5–403; *see, e.g., State v. Broberg,* 342 Md. 544, 564, 677 A.2d 602 (1996)(trial court's determination under Rule 5–403 was implicit in its ruling). We review the court's factual finding to determine whether the evidence was sufficient to support it, and whether the trial court abused its discretion in admitting it. *See, e.g., Gerald v. State,* 137 Md.App. 295, 304–05, 768 A.2d 140, *cert. denied,* 364 Md. 462, 773 A.2d 514 (2001)(when decision to admit evidence was based on factual finding supported by substantial evidence, court did not abuse its discretion in admitting it).

Based on our review of this record, we conclude that there was enough circumstantial evidence that Tiarah understood that there were medical reasons for telling Holden what happened. In contrast to the children in *Rachel T., Cassidy,* and *Low,* Tiarah was questioned in emergent circumstances, within a few hours of the assault, in a hospital setting. The interview was conducted by a registered and presumably uniformed nurse. That interview immediately followed Tia-

rah's brief examination in the emergency room by a triage nurse, who performed medical procedures, such as blood pressure and pulse checks, which young children experience even when seeking routine medical care. In addition, Tiarah already had seen an emergency room doctor, who questioned and physically assessed her for major medical problems. Moreover, in contrast to the ambiguous "who did this" questions that the two year old answered in *Cassidy*,[3] the very specific "what happened" information that Holden solicited from Tiarah was consistent with questions that nurses and doctors commonly ask even young children when they seek medical assessment and treatment. Tiarah's responsive answer, and her later description of her experience at the hospital in medical terms (*i.e.*, "when I got a needle") also support the trial court's finding that Tiarah understood that there was a medical reason for truthfully telling nurse Holden what had been done to her.

We do not agree that Tiarah was too young to understand that she was being asked to describe what happened so that Holden and Dr. Bentman could make sure that she was not hurt or sick. In *In Rachel T.*, we held that a child the same age—four years old—understood that statements she made to a treating psychologist describing sexual abuse were for treatment purposes. *See In re Rachel T.*, 77 Md.App. at 36, 549 A.2d 27; *see also Morgan v. Foretich*, 846 F.2d 941, 948–49 (4th Cir.1988)(cited in *Bo Peep Day Nursery*, 317 Md. at 590, 565 A.2d 1015, for the same proposition). Because there was sufficient circumstantial evidence that Tiarah described the assault to nurse Holden in contemplation of medical diagnosis and treatment, the trial court did not err in concluding that the child's statements were admissible under Rule 5–803(b)(4).

Webster further argues that the identity of the perpetrator ("a man I don't know") and his stated intent to "keep on doing" the licking were not "reasonably pertinent" to such

---

3. The ambiguity in *Cassidy* was whether the child's response that "Daddy did it" referred to her physical bruising and injuries or to suspected sexual abuse. *See Cassidy*, 74 Md.App. at 33, 536 A.2d 666.

diagnosis or treatment. We find it unnecessary to decide whether this portion of Tiarah's statement was admissible, because any error in admitting it was harmless beyond a reasonable doubt. *See Baker v. State*, 332 Md. 542, 560, 632 A.2d 783 (1993), *cert. denied*, 511 U.S. 1078, 114 S.Ct. 1664, 128 L.Ed.2d 380 (1994) (error in admitting hearsay is subject to a harmless error review). The statement did not identify Webster as the assailant, and the portion in which the child claims that the assailant said he would "keep on" merely repeated the same account that Tiarah gave in the videotaped interview. *See, e.g., Thomas v. State*, 301 Md. 294, 309, 483 A.2d 6 (1984), *cert. denied*, 470 U.S. 1088, 105 S.Ct. 1856, 85 L.Ed.2d 153 (1985)(when improperly admitted evidence is cumulative, prejudice is materially reduced).

## F.

### Conclusion

■ Having decided that the State proved the foundational requirements for the medical treatment exception to the rule against hearsay with respect to Tiarah's description of the assault, we must proceed to determine whether its admission violated Webster's Sixth Amendment right of confrontation. *See Gregory*, 40 Md.App. at 324, 391 A.2d 437. We find no constitutional reason to exclude Tiarah's statement to Holden.

Our conclusion is supported by our decision in *Prince v. State*, 131 Md.App. 296, 302, 748 A.2d 1078 (2000), in which we held that Maryland's statute permitting admission of certain hearsay statements by child sex abuse victims "passes muster under the confrontation clause." Under Md.Code (2001, 2002 Cum.Supp.), section 11–304 of the Criminal Procedure Article, some statements by a child sexual abuse victim under age twelve may be admissible even through a nontreating physician. In *Prince*, we held that statute constitutional because consideration of the enumerated factors therein "guarantee[s] the trustworthiness of the child's statements." *Id.* at 302, 748 A.2d 1078.

Although the challenged statement by Tiarah was not admitted under this statutory exception, these same factors provide a relevant framework for our Sixth Amendment review. Subsection 11–304(e) sets forth the following factors considered to be "[p]articularized guarantees of trustworthiness."

(i) the child victim's personal knowledge of the event;

(ii) the certainty that the statement was made;

(iii) any apparent motive to fabricate or exhibit partiality by the child victim, including interest, bias, corruption, or coercion;

(iv) whether the statement was spontaneous or directly responsive to questions;

(v) the timing of the statement;

(vi) whether the child victim's young age makes it unlikely that the child victim fabricated the statement that represents a graphic, detailed account beyond the child victim's expected knowledge and experience;

(vii) the appropriateness of the terminology of the statement to the child victim's age;

(viii) the nature and duration of the abuse or neglect;

(ix) the inner consistency and coherence of the statement;

(x) whether the child victim was suffering pain or distress when making the statement;

(xi) whether extrinsic evidence exists to show the defendant or child respondent had an opportunity to commit the act complained of in the child victim's statement;

(xii) whether the statement was suggested by the use of leading questions; and

(xiii) the credibility of the person testifying about the statement.

We need not separately examine each of these factors because our discussion already has touched upon most of them. The circumstances surrounding Tiarah's statement that she had been licked include Tiarah's personal knowledge, a contemporaneous written account made by a trained nurse

whom the trial court found credible, lack of any motive to fabricate, an immediate and initially consistent description of the assault, admitted opportunity to commit the assault, and compelling extrinsic evidence that was consistent with the child's account. Using these statutory factors, we hold that the decision to admit Holden's report of Tiarah's statement did not violate Webster's Sixth Amendment rights.

## II.

### Mistrial

█ At trial, Wolf described Tiarah as "crying and upset" when she arrived. Over defense counsel's hearsay objection, Wolf testified that Tiarah told her that while "she was sitting on the toilet," a "man ... walked in" and "bent down and licked her do-do."

The next day, the trial court reconsidered and reversed its decision to admit that testimony as a "prompt complaint of sexually assaultive behavior" under Md. Rule 5–802.1. The court explained that this exception to the rule against hearsay requires the declarant to be available for cross-examination at trial. Because Tiarah was not going to testify, the trial court believed that this exception did not apply.

Defense counsel then asked for a mistrial, arguing that Webster had been severely prejudiced by Wolf's testimony, particularly in light of the credibility questions raised by Tiarah's account of the assault during the videotaped interview. In defense counsel's view, a curative instruction would only highlight Wolf's improperly admitted testimony.

The prosecutor responded that there was little prejudice from the challenged testimony because similar statements by Tiarah already had been presented to the jury in the videotaped interview and nurse Holden's testimony. The trial court denied the defense motion for mistrial. Noting that "the offensive testimony" was "sandwiched" between the statements in the videotape and to nurse Holden, the court con-

cluded that the prejudice did not "rise[ ] to the level" that a mistrial was necessary.

Instead, the court addressed Webster's concern about highlighting the inadmissible testimony by striking all of Wolf's testimony from the record, and giving the following curative instruction:

> Ladies and gentlemen, yesterday you heard from a witness Deputy Wolf. The [c]ourt instructs you that you are to disregard all of her testimony. That has been stricken. You are to disregard it completely.

Webster contends that the trial court erred in denying him a mistrial because the improper testimony about Tiarah's statement related to a central issue in the case, and the jury was not promptly told to disregard it. The State counters that a mistrial was not warranted for the reasons cited by the trial court. Moreover, it argues, the court's instruction to disregard all of Wolf's testimony "eliminat[ed] the possibility of highlighting the erroneously admitted evidence." As alternative grounds for affirming the trial court, the State points to "the overwhelming evidence of Webster's guilt" and argues that Webster "received more than that to which he was entitled in having Deputy Wolf's testimony stricken because it appears that the victim's statements to Deputy Wolf would have been admissible as an excited utterance[.]"

We need not address the State's excited utterance and overwhelming evidence arguments because we agree with the trial court that the prejudice to Webster from any erroneous admission of Tiarah's statement to Wolfe was substantially diminished by its cumulative nature and the curative instruction to disregard it. Whether to grant a mistrial lies in the sound discretion of the trial judge, who is in a superior position to evaluate the extent and nature of prejudice from erroneously admitted evidence. *See Wright v. State,* 131 Md.App. 243, 253, 748 A.2d 1050, *cert. denied,* 359 Md. 335, 753 A.2d 1032 (2000). A mistrial is "an extreme sanction" that courts generally resort to only when "no other remedy will suffice to cure the prejudice." *Burks v. State,* 96 Md.App.

173, 187, 624 A.2d 1257, *cert. denied,* 332 Md. 381, 631 A.2d 451 (1993). We will reverse a decision to deny a mistrial only when the defendant was so severely prejudiced that he was denied a fair trial. *See Rainville v. State,* 328 Md. 398, 408, 614 A.2d 949 (1992).

The jury heard substantially identical statements from Tiarah herself in the videotape interview and from nurse Holden. Wolf's testimony to the same effect did not have the impact that Webster supposes, because the cumulative nature of that testimony diminished its prejudice. *See Thomas v. State,* 301 Md. 294, 309, 483 A.2d 6 (1984), *cert. denied,* 470 U.S. 1088, 105 S.Ct. 1856; 85 L.Ed.2d 153 (1985).

In addition, an appropriate curative instruction may prevent material prejudice. *See Collins v. State,* 318 Md. 269, 286–87, 568 A.2d 1, *cert. denied,* 497 U.S. 1032, 110 S.Ct. 3296, 111 L.Ed.2d 805 (1990). In the circumstances presented by this case, we assume that the jury followed the trial court's instruction to disregard Wolf's testimony. *See Wilson v. State,* 261 Md. 551, 570, 276 A.2d 214 (1971), *cf. Carter v. State,* 366 Md. 574, 592, 785 A.2d 348 (2001)(curative instruction that highlighted inadmissible "other crimes" evidence was inadequate to cure prejudice). "[W]here the trial court has admonished the jury to disregard the testimony it has been ... consistently held that the trial court has not abused its discretion in refusing to grant a motion for a mistrial." *Wilson,* 261 Md. at 568–69, 276 A.2d 214.

We hold that the trial court did not abuse its discretion in giving the curative instruction and denying Webster's motion for a mistrial.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**